## HALL *v.* AMERICAN BANKERS SAFETY COMPANY.

[77 South. 526, Division B.]

CORPORATIONS. *Fraud of organizer. Secret profits. Sales. Reservation of title.*

Where an organizer of a bank contracted for the bank for a safe, with a provision in the contract that title to the safe was to remain in the seller until fully paid for, the fact that there was a fraudulent agreement between the seller and the organizer, that a fictitious price should be placed on the safe, the organizer to get the difference between the real and fictitious price, did not make the sale one to the organizer, so as to constitute a waiver of the clause of the contract as to the retention of the title, nor prevent the seller from recovering the safe from the bank where no payments thereon had been made.

APPEAL from the chancery court of Oktibbaha county, HON. A. J. McINTYRE, Chancellor.

Suit in equity by the American Bankers Safety Company against W. W. Hall, receiver of the Long View Bank, to recover possession of a safe. From a decree for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*W. W. Magruder,* for appellant.

The appellee cannot recover this safe under its reservation of title by contract for the manifest reason that it sold the safe vault door, and equipment to Hardin Adams for the purpose of resale.

As the authority to sustain this contention, we cite; *Columbus Buggy Co.* v. *Turley,* 73 Miss. 529; *Parry Mfg. Co.* v. *Lowenburg,* 88 Miss. 532; *Watts* v. *Ainsworth,* 84 Miss. 40; *Fairbanks Co.* v. *Graves,* 90 Miss. 453; *Merchants & Farmers Bank* v. *Schaaf,* 66 Mo. 402.

The fundamental propositions involved in all of these cases is that no seller will be permitted to evade the law by ingenious and specious contracts, cunningly devised to retain a title which the vendee is authorized to pass, or in other words, that complainant in this case could not retain title to a safe vault door, and equipment, for which they were contracting with Hardin Adams and authorizing him to resell to the Longview Bank, at the same time, giving the said Hardin Adams their actual aid, comfort, and co-operation in the perpetration of a nefarious and infamous scheme by which the Longview Bank was to be defrauded of its scanty funds.

Counsel for complainant appear to attach much importance to the fact that the written contract itself in this case does not contain any specific authority to Hardin Adams for the resale of the property in controversy. This position is completely answered in the case *Bank of Hazelhurst* v. *Goodbar,* 73 Miss. 566.

The principle involved in all of these cases is the same, whether falling specifically under section 4784, Mississippi Code of 1906, or controlled by the law as announced in the Goodbar case which is based upon the sound, legal proposition that whenever a seller clothes a buyer with the *indicia* of ownership and authority to resell, either as an integral part of the original contract or by contemporaneous parol agreement, the conveyance becomes fraudulent in law—either actually or constructively—depending upon the particular facts of each case.

Whether the buyer handles the goods upon a commission basis or for his own account, under the decisions, is absolutely immaterial. This proposition is emphatically settled, in: *Shannon* v. *Blum,* 60 Miss. 828; *Bank* v. *Studebaker,* 71 Miss. 544; *Paine* v. *Hall,* 64 Miss. 175; *Hall* v. *Berg,* 65 Miss. 187.

Counsel for complainant cited in the lower court *Gayden* v. *Tufts,* 66 Miss. 691, as authority for the proposition that an assignee has no better title than his assignor. That case has no bearing or value in the consideration of the instant case because the facts here differentiate this case from the Tufts case as clearly as night is differentiated from day. No equities intervened in that case and the contract there in the statement of facts on page 691, specificially shows that it was duly acknowledged and recorded in the public records of the county. This was not a secret reservation of title to the injury of creditors but constructive notice was honestly and publicly given by the official records of the state.

They also cite *Tufts* v. *Stone,* 70 Miss. 54, but again they are hoisted by the same petard for the supreme court in its opinion states that the written contract was acknowledged and recorded.

In *Andrews* v. *Partee,* 79 Miss. 80, a man by the name of Dye executed a trust deed to Moore on certain property including some saw logs, the *cestui que trust* testi-

fying that a contemporaneous parol agreement was made between him and the mortgagor by which the latter was to be permitted the use of the logs to finance his business "until he could get himself in shape." The court in its opinion announced, "Notwithstanding the good faith and honest purposes of both of these men, in fact, still the law denounces a trust deed hampered by such an agreement or understanding as fraudulent and void as to creditors. The rule is a hard one but it is too well settled by authority for us to disturb it.

In the instant case, complainant undertakes to rely upon an equitable mortgage created by the written contract, dated July 8, 1913, in which Hardin Adams is the grantor by operation of law as well as by the contract itself. The same parol agreement which exists in this case, as admitted by complainant, would constitute "The fly in the ointment," in the Andrews case.

The same principle is announced in *Harmon* v. *Hoskins*, 56 Miss. 142. Also see *Joseph* v. *Levi*, 58 Miss. 843, in which the court approves *Harmon* v. *Hoskins, supra,* and again emphasizes the controlling principle in this line of cases

In *Johnson* v. *Tuttle,* 65 Miss. 492, the court declares in the consideration of a similar case that: "The law imputes conclusively a fraudulent purpose without regard to the actual motives of the parties." The court furthor says: "But it is immaterial, whether the agreement or understanding. . . . was expressed on the face of the instrument or appears to exist by evidence *aliunde*. In legal contemplation the effect is the same in both cases."

"*He who comes into equity must come with clean hands.*"

Complainant cannot recover in this case because of the equitable maxim, "He who comes into equity must come with clean hands." This maxim has been enforced in the courts of England and in the various states through-

out this country from time immemorial. The only diffi-
culty that the courts have found has been in its appli-
cability to the facts of adjudicated cases. That diffi-
culty in the instant case will be infinitesimal because
the facts clearly bring complainant's case within the
condemnation of this maxim.

Care must always be taken to avoid confusion of this
maxim with the similar maxim: "He who seeks equity
must do equity." The analogy between the two is neces-
sarily close but the maxim upon which we rely is far
more comprehensive than the other maxim in its scope
and operation.

We refer the court to Pomeroy's Equity Jurisprud-
ence, sections 387-404.

Counsel for complainant in their brief deny the ap-
plicability of this maxim, insisting that the contempor-
aneous agreement of Hardin Adams with complainant
was merely incidental to the contract itself and that
complainant's right to recovery is based solely upon
the written contract. We insist that the entire trans-
action between complainant and Hardin Adams is sub-
ject to the scrutiny of the court in the consideration of
the rights of this defrauded bank.

We invite the careful consideration of the court to
the case, *Woodson* v. *Hopkins,* 85 Miss. 171.

This case will illustrate the devious methods of fraud
and chicanery by which cunning grafters undertake to
secure "something for nothing." A careful perusal of
the testimony in response to interrogatories, propounded
under the statute, will in our opinion demonstrate be-
yond peradventure that appellee is not entitled to re-
covery of the property involved in this litigation.

In the records of this tribunal, this case might well
in the furture be styled as "The adventures of J. Rufus
Wallingford." About the only difference between com-
plainant and that genial gentleman that we are able to
discover is that Wallingford did not have the temerity

to invoke the jurisdiction of the courts in the consummation of his nefarious schemes while complainant goes him one better.

Wherefore, appellant asks that the decree of the lower court shall be reversed and that judgment final shall be rendered in this cause, dismissing appellee's bill, and denying all relief as sought therein.

*Leftwich & Tubbs*, for appellee.

To begin with the findings of the chancellor and the facts must all be resolved in appellee's favor. Counsel claims as one defense that when complainant by contract sold the safe to Hardin Adams and reserved title for the purchase money, and then shipped the safe to Longview Bank, that it contracted with Adams for a resale of the safe to the bank, and thereby waived its lien, and to sustain this contention cites: *The Columbus Buggy Co.* v. *Turley & Parker*, 73 Miss. 529; *Watts* v. *Ainsworth*, 89 Miss. 40; *Fairbanks Co.* v. *Graves*, 90 Miss. 453; *Parry Mfg. Co.* v. *Lowenberg*, 88 Miss. 532.

On the other question of conditional sales, and the right of the subpurchaser of property sold on condition, we quote under this head. 6 Am. & Eng. Ency. of Law (2 Ed.), which is as follows:

"3. Of Third Persons—a Bona Fide Purchaser. Subpurchaser of property sold on condition precedent acquires no title against vendor,—except where the case is controlled by statutes providing otherwise, the general rule is that where personal property is sold and delivered to the vendee on condition that the title is to remain in the vendor until the purchase price is paid or secured, the vendee who has not yet acquired title by the performance of the condition can convey no title even to a *bona-fide* purchaser that can be enforced against the original vendor; and that the latter, if guilty of no laches, may recover the property from such purchaser from his vendee without any previous demand."

It will be seen that under this text are cited decisions from many states including the Mississippi ones, and we refer especially to the note quoted from *Coggill v. Hartford Ry. Co.,* 3 Gray (Mass.) 545, on page 488.

### "Clean Hands"

We come now to the "clean hands" proposition presented in the answer and argument of the learned counsel, the charge being that the outside arrangement, lying wholly outside of the contract sued on, whereby the American Bankers Safety Co. was to bill to the Longview Bank at one thousand, four hundred and twenty-five dollars, and when the same was collected to pay all of it above eight hundred, ten dollars, to Hardin Adams and Guill Barber, was a corrupt agreement whereby complainant was colluding with Adams and assisting him in reselling these goods at a profit to the Longview Bank in violation of his trust obligation to that bank. Counsel traveled a long way from the case in attempting to show that complainant was engaged in this kind of business, but neither by independent evidence nor by cross-examination has he adduced any evidence to sustain this charge, and certainly if he had, it would be incompetent in this case. The "clean hands" doctrine, as all the text-writers and courts agree, does not apply to any kind of obliquity or illegality except that which arises out of the case in hand; the wrong must grow out of the very transaction decided; the most corrupt criminal cannot be driven out of a court of equity if he has been honest in the transaction which he is enforcing.

Take another view of this question. The only relief that the bank could have or the receiver representing the bank, would be to subject to its use the right of Adams to the share of the commissions. *Wynn v. Dillon,* 27 Miss. 494; *Trice v. Comstock,* 61 L. R. A. 176.

Counsel cites Pomeroy on Equity, 397; but we especially call the court's attention to the limitations of the

doctrine set up in section 399, of that learned writer. The case of *Truce* v. *Comstock,* 61 L. R. A. 176, was a case of agency; and when the court reads it, it will be seen that distinguished counsel for appellees who won below, denounced just as vigorously the conduct of complainant, as learned counsel does here, but still the lower court was reversed, and as will be seen on page 181, the court discriminated and said:

"The acts to which defendants object neither conditioned nor affected the equity which the complainants now seek to enforce."

So here, we argue that when this complainant seeks to retake his own goods, title to which was reserved because they have never been paid for, his doing so is in no manner conditioned upon nor affected by the scheme of Hardin Adams which he was never able to carry out to obtain a profit from his principal by having the seller of the goods pay the bill and conceal the profit. In the case of *Wooten* v. *Miller,* 7 S. & M. referred to by Judge WHITFIELD in the *Woodson Case,* the distinction here claimed is plainly set out and approved by the supreme court. On page 386, of that report, the court says with approval:

"There are cases which decide that where the demand is collateral to the original transaction, as where money has been loaned to pay an illegal debt, although the lender knew the illegal purpose, he may recover of this class, are *Faikney* v. *Regnons,* 4 Burr; *Petrie* v. *Hannay,* 3 T. R., but the principle upon which they act would not be applicable here unless there had been some collateral undertaking of Robert Wooten to pay."

In the last subdivision of the brief we assumed that the transaction here was tainted with such illegality as. to affect complainant; we now argue, and the authorities are perfectly clear on the point that there was no illegality at all in so far as this complainant was concerned. The most that can be said about the American

Bankers Safety Company's participation in Adams' scheme, is that it .may have suspected that Adams expected to deceive his principal or the bank of which he was the agent and president, and get a profit, which the bank could of course recover from him, is not illegal at all, and is not that form of illegality that the "clean hands" doctrine effects. *Tracy* v. *Talmage,* 87 A. D. 132; *Wooten* v. *Miller,* 7 Miss. 308; *Buck* v. *Albee,* 62 A. D. 564; *Tracy* v. *Talmage,* 67 A. D. 146-7.

On page 5 of counsel's brief he uses this language: "Upon delivery of the safe and outfit to the Longview Bank by the American Bankers Safety Co. under instructions from Hardin Adams, the title was vested in the Longview Bank by virtue of the implied contract of sale created by law from Hardin Adams to the Longview Bank."

We have studied counsel's analysis of the situation on this page of his brief with much interest. In every logical analysis there must be a sound premise; we grant that title to property must vest somewhere; there is no question in the world where the title is in this case; it was retained by complainant as security for its purchase money. There can be no question about that whatever the writing establishes it; it never did pass to Hardin Adams; it never did pass to the Bank, and there is not a word in the whole testimony showing that the purchase of the safe by the bank's officers at any price was ever discussed or even hinted at. With the legal title outstanding in the vendor and possession of the safe merely loaned to Hardin Adams; with the doctrine of *caveat emptor* standing out in all its virility, by what course of reasoning can any court conclude that the Longview Bank became the owner of the safe by an implied contract of sale. *Tufts* v. *Stone,* 70 Miss. 54; *Gayden* v. *Tufts,* 68 Miss. 691.

As decided in all Mississippi cases, from *Ketchum & Cummins* v. *Brennan,* 53 Miss. 596, down, the reserva-

tion of title is good against all the world, but for the sign statute section 4784, of the present code. That statute can only be invoked by creditors who have obtained a lien by attachment who have bought the property in market overt and as our court has distinctly held, the vendee himself, who is Hall in this instance, *pro hac vici,* cannot set up a claim like this receiver is trying to set up; he is a volunteer. *Ketchum* v. *Brannan,* 53 Miss. 596; *Duke* v. *Shackleford,* 56 Miss 552; *Fairbanks* v. *Graves,* 90 Miss. 556; 24 Am. & Eng. Enc., p. 77.

We all recognize we suppose that witness Coleman's answer was a legal conclusion of his. The chancellor simply found that the refusal of the appellee to ship or deliver the safe to Adams and all the facts, when taken together, looking through the form to the subdivision, the sale was really to the Bank of Longview; the chancellors decree was eminetly just and we ask affirmance.

STEVENS, J., delivered the opinion of the court.

The controlling facts, as we interpret the record, are as follows: One Hardin Adams attempted to organize and establish a small banking institution at Longview in Oktibbeha county with a capital of ten thousand dollars. Organization was effected about August 18, 1913. Adams was likewise interested in the organization of a bank at French Camp, Miss. On July 8, 1913, Adams went to the offices of appellee, the American Bankers' Safety Company at Cincinnati, and placed an order with appellee for two bank safes, one for the Longview Bank, the other for the French Camp Bank. The written contract for the two safes and vault doors was executed by Hardin Adams individually, for a total consideration of one thousand six hundred and twenty dollars. There was a provision in the contract that "said safe to re-

main the property of the American Bankers' Safety Co. until paid for in full." The contract further provided that "safe and doors to be ordered out when wanted by Mr. Adams. These orders to be shipped when notified," and contained the further provision, "bill to Longview Bank, Longview, Mississippi, also Bank of French Camp, French Camp, Mississippi." The net price of each safe and vault door was eight hundred and ten dollars. There was an understanding, however, between Adams and appellee company, the seller of the property, whereby the latter was to render a statement to the Bank of Longview showing a larger and fictitious consideration and Adams was to receive the difference between eight hundred and ten dollars and the price which appellee should finally collect from the bank. About the time the Bank of Longview was organized, Adams ordered the safe and vault doors to be shipped to the Longview Bank, but canceled the order for the French Camp Bank. The safe was duly received by the Longview Bank and installed and accepted by the bank as its property. It appears that Adams and his brother controlled eight thousand five hundred dollars of the capital stock, but the capital stock of the bank was never in fact paid in, and there never was at any time any real basis of credit for the corporation. As stated by counsel, the bank was organized "on wind," and Adams, after realizing all he could for himself, fled the country and left the bank without assets. In this attitude a receiver was appointed to take charge of and wind up the affairs of the failed corporation. In the administration of the estate, appellee company filed a petition in the chancery court having jurisdiction of the insolvent estate, setting out the fact that petitioner had sold the safe and vault door to "one Hardin Adams, the organizer and active functionary," of the said bank, and exhibited the written contract retaining the title, and prayed that the receiver be directed to turn

over the safe to appellee as the real owner.  This petition was answered by the receiver, acting for the bank, and in the answer it is averred that Hardin Adams was the real purchaser of the property at eight hundred and ten dollars; that the property was sold to Adams for purposes of resale to the bank; that appellee knew Adams intended to sell the property to the bank at a profit; that Adams conspired with appellee in having the latter bill the property to the bank at the price of one thousand four hundred and twenty-five dollars in order that Adams could make an unlawful profit of six hundred and fifteen dollars; and that appellee by its conduct had waived the provision of the contract whereby title was retained. It is further averred in the answer that Adams is indebted to the bank in approximately the sum of eight thousand dollars, which the bank ought to be permitted to offset against the purchase price of the property. Proof was taken and the issue heard and decided by the chancellor, who rendered a decree granting the prayer of appellee's petition and from this decree the receiver prosecutes an appeal.

Looking through the form to the substance, the Bank of Longview purchased the bank safe and vault door from appellee, and not from Hardin Adams.  Adams at all times was acting as the promoter, organizer, or agent of the Bank of Longview.  Of this appellee company was fully advised.  Appellee never at any time agreed to ship Hardin Adams a safe on credit. It took an order in his name for a safe to be shipped and billed to the Longview Bank. This is evidenced by the original contract itself.  Bill for the purchase price was to be sent direct to the Longview Bank and collection for the property made from the bank.  The name of the Longview Bank was painted upon the face of the safe before it was shipped.  Adams was not only the ostensible agent or organizer of the bank, but he in fact was the dominant voice, and had the controlling

interest in the attempted or abortive organization, and became the president and manager of the institution. The record does not show any resolution of the directors authorizing the purchase of this property, but certain it is that the bank had no contract to purchase the safe from its own president and organizer. Adams was not a trader or dealer in bank safes, and never at any time assumed to sell the Longview Bank a safe of any kind. There was fraud and shameful collusion between the American Bankers' Safety Company and Hardin Adams, whereby Adams expected to pocket a "rake-off" or unlawful commission. If this were a suit by appellee for the unlawful consideration of one thousand four hundred and twenty-five dollars, appellee could not recover. But does the fraud shown prevent appellee from repossessing its property? In the administration of the estate the receiver found and took possession of the safe with the knowledge that the property had not been paid for. In returning his inventory he stated the facts. Appellee had not been paid anything on the purchase price, and it could not, without the authority of the chancery court, bring an action of replevin. The petition in this case is an ancillary petition asking the court to direct the receiver as to what disposition he shall make of property in his possession. The bank on discovering the fraudulent understanding between appellee and Adams could have rescinded the trade; and upon doing so would return the property to the seller. The bank could also elect to pay the net price of eight hundred and ten dollars and keep the property. The court in the final decree found that if the safe was sold by the receiver it would not likely bring the purchase price of eight hundred and ten dollars, and for that reason elected to return the property to complainant. The court, we think, disposed of the controversy in a sensible way, and we see no cause to upset the result reached. Authorities on our "sign"

statute and on the legal proposition that a seller waives retained title provisions of a contract when the property sold is delivered to a trader or other person for purposes of resale have no application to the present issue. The only question in this case is whether the door of the court should be opened at all to the complainant. On this point both parties are not free from criticism. Appellee could not sue the receiver in an action of replevin without the permission of the chancellor. The bank was never legally organized, and never had any capital stock sufficient to buy a safe. On the facts of this particular record we are of the opinion that the learned chancellor was justified in returning to appellee its property.

*Affirmed.*

ETHRIDGE, J. (specially concurring). I concur in the opinion and conclusion reached in this case for the reason that the equity court had taken possession of the safe in question, and suit at law could not be maintained without an order of the court. If no receiver had been appointed the appellee could maintain a suit of replevin for the safe. Ordinarily equity would give no aid whatever to a party in the situation of the appellee.